The above named defendant company (hereinafter called the Middlesex Company) in addition to the usual business of a trust company was also engaged in the business of loaning or investing moneys on real estate bonds and mortgages, which it thereafter sold and assigned to investors, accompanied by its own guarantee of payment. Such sales and assignments were sometimes of the whole of such a bond and mortgage; and sometimes of only a part interest in such a bond and mortgage — by a so-called "participation certificate."
One such bond and mortgage in the principal sum of $12,500, covering a single store building in New Brunswick, was made to the Middlesex Company by one Einstein in 1927. A participation certificate for $4,000 of this bond and mortgage was thereafter sold by the Middlesex Company to the present petitioner, Metlar; and at various dates five other participation certificates for various amounts, totaling $4,200, were likewise sold to five other assignees. The balance of the bond and mortgage — an interest of $4,300 — remained in the Middlesex Company, unsold, at the time the latter company became insolvent and its assets were taken over for liquidation by the commissioner of banking and insurance, on February 14th, 1933.
On that date the mortgagor Einstein was in arrears for two semi-annual payments of interest on the bond and mortgage, and was also two years in default in the payment of taxes on the mortgaged premises. These defaults subsequently continued and increased, and the commissioner determined that it was advisable to commence foreclosure suit against the mortgagor. The petitioner Metlar, believing it inadvisable to foreclose, filed the present petition seeking to have it determined *Page 594 
(1) that the interests of himself and the other holders of participation certificates in this bond and mortgage are prior and paramount to the interest retained by the Middlesex Company (and now held by the commissioner), and entitled to priority in payment out of any proceeds realized in the liquidation of such bond and mortgage; and (2) that the commissioner be restrained from instituting suit to foreclose such bond and mortgage, until such time as petitioner shall consent thereto.
All the holders of the other participation certificates have been brought in as respondents. All but one — ($1,000) — are represented by counsel and join in the contentions of Mr. Metlar. Counsel have also appeared representing holders of participation certificates in other mortgages, as to which a similar situation exists — and takes a similar position. Joining with the commissioner in opposing the position of Metlar are counsel representing divers depositors or general creditors of the Middlesex Company.
Primary resort, for information as to the respective rights given to the assignees or certificate holders and retained by the Middlesex Company, is naturally to be made to the provisions of the assignment or participation certificate. Difficulty arises, in the instant case, from the ambiguity or apparent ambiguity of those provisions.
The assignment certificate made to Metlar recites that the Middlesex Company has received from him $4,000, and in consideration thereof assigns and transfers to him "the sum of $4,000, out of and from" the Einstein mortgage of $12,500 owned by the Middlesex Company, "it being the intention of this instrument to permit the assignee to participate in said mortgage and the accompanying bond given therewith, to the extent of $4,000, which amount the said assignor guarantees payment of,"c.
Payment of the $4,000 is guaranteed to be made on or after February 5th, 1930 (the date of maturity of the bond and mortgage) and guarantee is also made of payment of interest thereon, at five and one-half per cent., up to the time the principal is paid. The Middlesex Company agrees to pay the *Page 595 
assignee such interest on February 1st and August 1st of each year; and is authorized by the assignee "to receive the interest and principal from the mortgagor for the participating certificate holders."
The assignment of "the sum of $4,000, out of and from" the Einstein bond and mortgage, if standing alone, would doubtless constitute an equitable assignment of that sum out of the moneys secured by that bond and mortgage, giving the assignee an interest in that bond and mortgage to the amount of $4,000, prior to the interest retained by the assignor. But the meaning and effect of that phrase is explained and limited by the subsequent provision that the intent of the assignment is to permit the assignee to participate in said mortgage (and bond) to theextent of $4,000; of which amount the assignor guarantees payment.
Light is also obtained upon the intent of the parties, from the course of business of the Middlesex Company with respect to these participation certificates. Concededly, it was understood by assignor and assignee that the assignor could, and probably would, make other assignments of interests in various amounts in this bond and mortgage up to the full principal sum of $12,500. (If this had not been conceded, the same result would ensue from the fact that that was the course of conduct of this business by the Middlesex Company, and by the reference in the assignment certificate to "the participating certificate holders," notice was given to the assignee that there were or might be other assignees interested therein, and he was put on inquiry as to the relative rights between himself and such other participating assignees.)
It is evident therefore that it was not the intention of the assignor, nor the expectation of the assignee, that the latter was to obtain by the assignment any preferential interest in the bond and mortgage superior to the holder or holders of the other $8,500 thereof. As a matter of fact there is neither proof nor allegation of any such belief or expectation by the assignee. The argument made by the petitioner and the other certificate holders, in support of their claim of priority or *Page 596 
superiority in interest over the interest which remained (unassigned) in the Middlesex Company, is simply the contention that such alleged superiority exists, under the present circumstances, as the result of (alleged) legal or equitable rules and principles.
Three different rules have been adopted in various jurisdictions in which the question of the relative rights of several owners of part interests in a single security has come before the court. One is known as the "earlier maturity" rule, which gives preference to the holder of the obligation which first becomes due and payable. Another is the so-called "prior assignment" rule, which gives priority in accordance with the respective dates of the several asignments to the respective holders of the obligations. The third is the so-called "prorata" rule, which distributes the proceeds of the security among the several part owners pro rata in proportion to the respective amounts of their several interests. See generally50 A.L.R. 543 et seq.; 41 C.J. 685, 687; 19 R.C.L. 658, 661; 42L.R.A. (N.S.) 183 et seq.
Whichever rule be adopted, is of course adopted as a rule of equity, and its operation may be modified or suspended in any particular case where such a course is necessary in order to do equity under the particular circumstances. The precise question involved in the instant case has not hitherto been passed upon by our courts, but there are a number of decisions, hereinafter referred to, dealing with situations generically similar to the present one.
The pro rata rule is the one which seems most equitable to be applied as a general principle — and which is indicated by the determinations in somewhat similar New Jersey cases. It will be here adopted. One of the basic and fundamental principles of equity is that "equality is equity" — that the rights of several parties similarly circumstanced should all stand on the same footing. Where the circumstances vary, it may of course be necessary to vary the general rule by the application of other particular equitable principles — such as those of estoppel, the protection of a purchaser for value without notice, and the like. *Page 597 
In the instant case, however, it would seem that the several parties are all similarly circumstanced, and no particular facts are shown requiring any modification of the general rule. All of the several assignees took under similar circumstances. Each was making an investment in a loan protected by the security of an interest in the mortgaged premises, plus the guaranty of the Middlesex Company. Neither of them had any expectation or belief of priority in interest over any other assignee nor over the Middlesex Company as the owner of the unassigneed balance of the mortgage; nor was any such priority given by the terms of the assignments, nor any representation made by the Middlesex Company that any such priority was intended or would be had. In the instant case no question arises as to differing dates of maturity (for all are alike), although even if it did, it is not perceived that such a circumstance, without more, would either dictate or justify the awarding to one of the assignees any greater interest in the security simply because his obligation matured earlier than those of the others. See Collerd v. Huson, 34 N.J. Eq. 38.
Neither is it perceived that the respective dates of the investments by the several parties affords any ground for discriminating amongst them as to priority in interest in the security. The situation is essentially the same as if say ten separate bonds of $1,000 each and accompanying mortgages co-ordinate in lien, had been issued by the mortgagor to the Middlesex Company against the mortgaged premises, and assignments of one or more of such separate bonds and mortgages had been by the Middlesex Company made from time to time to the petitioner and the other assignees, with several remaining unassigned.
The petitioner argues that there is a particular circumstance in the present case which should result in the modification of the general rule, to wit, the fact of the guarantee by the Middlesex Company. The claim is made that as the result of that guarantee the interest in the mortgage which was retained by the Middlesex Company becomes an additional security to the assignees for the obligations due to them. Consideration will show that this is a non-sequitur. *Page 598 
The promise, or guarantee, of the Middlesex Company is of course a security available to the assignees in addition to the particular security of the mortgage interest assigned to them. That promise, however, stands on no different footing than any other promise or general liability of the Middlesex Company. No assignment of the unassigned balance of this mortgage, nor of any other assets of the Middlesex Company was made, or intended to be made, as security for that promise. The intent was, as has already been mentioned, that the balance of the particular bond and mortgage should remain available for assignment to other investors.
Neither does any assignment equitably result from the particular circumstances. All of the unassigned assets of the Middlesex Company are of course available for the payment of the debts of that company — including such liability to the present petitioner (arising from the guarantee) as remains unsatisfied after the particular security specially assigned has been exhausted. But that liability (if such there prove to be, in fact), stands on no higher footing than the liability to any other general creditor of the company. The Middlesex Company did not purport to give to the assignee any security for this promise of guaranty; and no assignment of any such security resulted by operation of law from the giving of the guaranty. Cf. Gausen v.Tomlinson and Van Winkle, 23 N.J. Eq. 405, and Vredenburgh v.Burnet, 31 N.J. Eq. 229, and Stevenson v. Block, 1 N.J. Eq. 338.
It is urged that to apply the pro rata rule as between assignee of part of the secured debt and the assignor who retains the other part, leads to inequality instead of equality; that where a mortgagee holding two notes of $1,000 each assigns one and retains the other and the mortgaged premises produce only $1,000, if the mortgagee shares pro rata therein he receives $1,500, or three-fourths (3/4) of his original investment of $2,000, while the assignee of half the loan receives only $500, or one-half (1/2) of his investment of $1,000; and that this is not right. What is there wrong about it? The argument seems based on curiously unsound logic.
In the absence of guaranty by the mortgagee to the assignee, *Page 599 
the latter has simply taken over one-half of the investment and put himself in the same situation as to that half as is occupied by the mortgagee as to the other half; the two are in precisely the same situation as they would have been if they had each originally contributed one-half of the loan to the mortgagor and had taken equal shares in the bond and mortgage. The fact that the assignee's interest comes to him through an intermediate assignment obviously makes no difference in the rights of the parties (in the absence of a guaranty).
The argument — and the conclusion by many authorities — that where the mortgagee gives to his assignee his guarantee of payment he should not be allowed to share pro rata in the proceeds of the security to the detriment of his assignee, has its sole logical basis (in the absence of any provision, agreement or representation between the parties in that behalf) in the theory of avoidance of circuity of action. As holders of the security they stand on an equal footing; each is entitled to his share of the proceeds of the security. If the assignee's share is not sufficient to pay him in full, the assignor is bound by his guaranty to pay him the deficiency. Giving the assignee a preferred interest in the proceeds in such a case simply enforces the performance of the guaranty; it saves the assignee the delay, trouble and cost of a separate suit to enforce the guaranty and works no inequity to the guarantor or anyone else — if there is no other person having an interest in the security.
In the instant case, however, there are other persons having an interest in the security — to wit, the general creditors of the insolvent assignor, represented by the commissioner as trustee. The issue is not between the assignees (participation certificate holders) and the assignor (Middlesex Company or its stockholders). It is between the assignees on the one side and the general creditors on the other. It is solely between successive assignees — for the trustee for the general creditors stands not in the position of the assignor, but in the position of an assignee of the unsold portion of the mortgage. The rights and interests of all general creditors in this unsold *Page 600 
portion of the mortgage (and in all the other assets of the Middlesex Company) are equal (proportionately to their claims). The claim of the assignees on the guaranty is a general, unsecured claim. To grant to them any greater right or interest in the bond and mortgage than that which was specifically assigned to them as security would be giving them security for an unsecured claim, and would be giving them, as such unsecured creditors, an unlawful and inequitable preference over the other unsecured creditors.
It is concluded that the interests of the several holders of assignments or participation certificates and the interest remaining (unassigned) in the Middlesex Company all stand on a footing of parity — that each has a fractional interest in the bond and mortgage proportionate to the ratio between the principal respectively invested and the principal of the whole bond and mortgage. By the insolvency of the Middlesex Company and the taking over of its assets by the commissioner as liquidating trustee, the commissioner became, in effect at least, an assignee of the interest theretofore remaining in the Middlesex Company — which interest he holds for the benefit of the depositors and other general creditors of that company.
As a matter of fact, there would seem to be more basis for argument that there was a positive equity in favor of the depositors as to this unassigned portion of the bond and mortgage, rather than in favor of the other assignees — because it appears that for years past the Middlesex Company, in its published statement of assets and liabilities, included amongst its assets the amount it had invested in bonds and mortgages or portions thereof, and this published statement may well have been relied upon by depositors in making or keeping their deposits.
The remaining question in the case is whether one of several holders of fractional interests in a bond and mortgage may, upon default by the mortgagor, bring suit to foreclose, against the opposition of the holders of the other fractional interests. That question must be answered in the affirmative. He holds security for the debt due him, and has the right to *Page 601 
realize on that security. The fact that others also have interests of equal priority, cannot operate to deprive him of, or limit his rights in that behalf — in the absence of any provision or agreement for such limitation. To-day most trust mortgages securing issues of bonds, contain a provision limiting the right of bondholders to demand or bring foreclosure suits, unless a certain percentage of such bondholders join in such demand; but in the instant case there is no such limitation. The opinion inCurrie v. Bittenbinder, 7 Atl. Rep. 872 (not reported in N.J. Eq.) is relevant, though not squarely in point.
Moreover, in the instant case, the commissioner is not merely the holder of a fractional interest in the security — he is the actual holder of the security, and a trustee thereof for the benefit of all the owners of fractional interests. One other holder of a fractional interest in this particular mortgage has not joined in requesting postponement of foreclosure suit. If, in his judgment as such trustee, the interests of the several fractional owners requires foreclosure to be brought, then unlessall the fractional owners join in opposing foreclosure, it is his duty, as well as his right, to foreclose.
The several fractional owners, as cestuis, have of course the right to have this court determine whether the best interests of all the cestuis requires postponement of foreclosure. That issue might be raised in the foreclosure suit itself; it is, with at least equal propriety raised here. No proof is shown, however, to warrant a finding that present foreclosure will be adverse to the best interests of the cestuis as a whole. The argument in seeking to prevent foreclosure rests on the fact that the opinion and wish of the majority of the cestuis (both in number and in amount of interest), is against present foreclosure. Obviously, that is insufficient to justify an order restraining foreclosure; and the issue must be determined against the petitioner. *Page 602