The Middlesex Title Guarantee and Trust Company (hereinafter called the "Middlesex Company" or "the company"), is a company incorporated in 1907 under the provisions of the Trust Company act of 1899. P.L. 1899 p. 450; 4 Comp. Stat. p. 5654. In addition to the more usual and ordinary business activities of a trust company — such as receiving deposit accounts subject to check, dealing in commercial paper, and acting as guardian, executor, trustee, or other fiduciary — it also guaranteed titles to real estate (as it had the specific power and right to do under its charter and under section 6, paragraph 14 of the Trust Company act aforesaid); and furthermore it carried on an extensive business of investing in real estate bonds and mortgages (both by making direct mortgage loans and by purchasing such bonds and mortgages from mortgagees). Some of these bonds and mortgages it in turn sold to others, with an accompanying guarantee by itself, of the payment of the principal and interest — these were known as "guaranteed mortgages." Others it sold in parts or fractional interests — known as "participation certificates" — also with its accompanying guarantee of payment of principal and interest; and of these some were completely sold, i.e., in fractional parts amounting in the aggregate to the whole of the principal of the bond and mortgage, and some were incompletely sold, i.e., the fractional parts so sold did not amount in the aggregate to the whole principal, leaving a fractional part remaining as an asset of the company. Still others remained completely unsold, as assets of the company. It had the power and right to make these guarantees of payment of principal and interest of the mortgages on parts of mortgages so sold by it. Kelly v. Middlesex Title Guarantee and Trust Co.,115 N.J. Eq. 369; 170 Atl. Rep. 892.
The company became insolvent and on February 14th, 1933, its assets were taken over by the commissioner of banking *Page 230 
and insurance for liquidation, under the provisions of the statute of 1931. P.L. 1931 p. 641. Subsequently, on the application of the commissioner, bringing in all interested parties, jurisdiction over the administration of this liquidation trust was taken by this court.
NOTE — It is to be noted, and borne in mind, that what is said herein is based (1) upon the rights and powers of this particular company under the particular provisions of its certificate of incorporation; (2) the provisions of the particular act under which it was incorporated; (3) the provisions of the particular assignments, certificates, guarantees and contracts actually made by this company; and (4) the provisions of the statute (of 1931) under which the commissioner took over its affairs and is operating. The statute of 1934 (P.L. 1934 ch. 3), differs from the statute of 1931 in the powers given to the court and to the commissioner, but was of course not in force or effect when this company was taken over by the commissioner on February 14th, 1933. While it would seem clear that the administration of the liquidation of the Middlesex Company may be brought under the operation of the act of 1934 — see section 2 thereof — if such course be deemed advisable, nevertheless this has not been done and the provisions of the act seem clearly not to be applicable at the present time to the present administration of the liquidation of the Middlesex Company.
The commissioner as such trustee in liquidation, petitioned this court for instructions in regard to divers questions arising in the administration of the trust. These questions are herein severally considered and determined. The trust which the commissioner has to administer is a multiple trust — not a single trust estate, but many. There is of course the trust estate of the general assets of the company; there are also numerous separate trust estates consisting of each bond and mortgage in which the equitable ownership was sold by the company, in parts, with accompanying guarantees by the company of the payment of the principal and interest of the respective shares of the mortgage debt.
Bonds and mortgages, bearing interest at six per cent., were *Page 231 
made by the mortgagors to the company as mortgagee. As to some of them, they were respectively legally assigned, outright, by the usual deed of assignment, to respective assignees, together with an accompanying contract of guaranty by the company. Under this contract of guaranty the company was appointed by the assignee as his agent to collect the interest, and retained one-twelfth of the interest in consideration of its guarantee and its services in collecting and paying over the income. These mortgages were termed "guaranteed mortgages."
As to other bonds and mortgages, partial interests in them were sold — part to one assignee, part to another, and so on. These partial assignments were known as "participation certificates." They also carried the company's guarantee of payment, and the company collected and paid over the interest, retaining one-twelfth thereof for its services and guarantee. In some instances the company also retained unsold portions of the bond and mortgage.
In all instances of participation certificates the company retained the possession and legal title to the bond and mortgage, and therefore was — and the commissioner now is — trustee as to each bond and mortgage for the benefit of the respective persons beneficially interested therein, including himself as trustee (for the general creditors) of the beneficial interest of the company therein.
Questions have arisen particularly as to the rights and interests of the holders of guarantees of title, holders of "guaranteed mortgages," holders of participation certificates, and depositors and other general creditors.
(a) Power to guarantee titles, mortgages and mortgage participations?
As has already been shown, ante, the Middlesex Company had power and right under the statute and its charter, to make these guarantees.
(b) Preferred rights of holders of these several guarantees?
The holders of the several guarantees mentioned have no prior or preferential rights or interests in the general assets of the Middlesex Company by virtue of the guarantees. *Page 232 
Those guarantees are simply promises — general liabilities of the company; no security for any of such guarantees was assigned to, or set aside for the benefit of the holders. Each assignee of a guaranteed bond and mortgage had, of course, a prior and preferential right in that bond and mortgage, by reason of his purchase of such assignment; so, likewise, does each holder of a participation certificate in a bond and mortgage have a prior and preferential right in that bond and mortgage, to the extent of the fractional share therein purchased by, and assigned to, him. Each holder of a title guarantee, a guarantee bond and mortgage, or a guaranteed participation certificate has a contingent
claim against the company by reason of such guarantee — contingent upon his sustaining a loss covered by his guarantee. Such contingent claims, however, are not secured claims, but only general claims against the general assets of the company, on the same footing as the claims of depositors or other general creditors. On the other hand, such contingent claims, if they mature into actual claims, are not restricted to any limited or particular part of the general assets of the company — any more than are any other general claims against the company.
It is urged that these claims are restricted to the amount of the company's capital and surplus, by virtue of the provisions of section 1, paragraph 8, of the Insurance Company act. P.L. 1902,p. 407. Whatever restrictions may be imposed by the language of that paragraph, are specifically imposed on corporations organized under that act. The Middlesex Company was not organized under that act; and the provisions of the act are neither expressly nor by implication applicable to a company organized under the Trust Company act.
The relationship between the company and its depositors is simply that of debtor and creditor. The depositor has no security for the amount of his debt; and his deposit is not a trust fund. The claims of depositors therefore are not entitled to any priority in the general assets of the company over the claims of the holders of guarantees when such claims shall have become actual, liquidated debts. *Page 233 
The rights of the holders of participation certificates and the reasons why they have no preferential rights in any portions of the bonds and mortgages remaining unsold and in the ownership of the Middlesex Company have been considered more fully and in detail in a separate opinion on the Metlar petition. Kelly v.Middlesex Title Guarantee and Trust Co., 115 N.J. Eq. 592;171 Atl. Rep. 823.
(c) Right of assignee of guaranteed mortgage to unrestricted possession and ownership of bond and mortgage?
The bonds and mortgages assigned and guaranteed by the Middlesex Company were and are obligations running to the Middlesex Company and bearing interest at six per cent. payable to the Middlesex Company by the obligors. By the contract between the Middlesex Company and its assignee, the assignee gets five and one-half per cent. interest, the Middlesex Company retains the right to collect the six per cent. interest from the mortgagor and to retain the one-half per cent., in consideration of its guarantee of payment of principal and interest and its services in collecting and remitting interest to the assignee.
By the contract of guaranty the company was constituted the agent or trustee of the assignee to collect the interest from the mortgagor. The commissioner has succeeded to that fiduciary position. So long as there is no default by the mortgagor in the payment of principal or interest to the commissioner — and no default by the commissioner to the assignee — the assignee has no right to take over the collection of interest for himself and deprive the commissioner of the one-half per cent. above referred to. Such a course would be a breach of contract by the assignee and would necessarily affect, and perhaps destroy, any claim by him on his guaranty; it could be restrained by this court upon the application of the commissioner. If there be any default by the mortgagor or the commissioner, the proper course for a dissatisfied assignee is to petition the court, if an agreement cannot be reached between himself and the commissioner.
By the contract between the company and the assignee, the company is also made the agent of the assignee to exercise *Page 234 
"every option or privilege" of the mortgagee under the bond and mortgage. This gives the company the right to foreclose upon default in the payment of principal by the mortgagor (either at designated maturity or accelerated maturity). The assignee therefore would not have the right to take over the mortgaged premises from the mortgagor without the consent of the commissioner — nor to commence a foreclosure suit without either such consent or the order of this court upon petition in that behalf. The assignee's rights are restricted by the rights of the company under the contract. If the rights of the company are violated by the assignee, the liability under the grantee would terminate.
(d), (e) and (f) Right of the commissioner to release rights in a guaranteed bond and mortgage in exchange for release of guarantee?
The commissioner has such right, if and when in his judgment such a course would be for the best interests of the trust estate. The statute of 1931 gives him full power and authority to compound and settle with any debtor or creditor or other person who has had dealings with the company or its property, in such manner and terms as he shall deem just and beneficial. P.L. 1931pp. 642, 643.
Even in the case of a guaranteed mortgage as to which no default has occurred, or is anticipated, there is always the possibility of unexpected default. It may be doubtful that the one-half of one per cent. interest to be received by the commissioner is sufficient to make it really worthwhile to continue the contract, and delay final liquidation.
It would, however, seem inadvisable for the commissioner to release the rights of the company in any bond and mortgage without obtaining release of the guaranty. The right to control the security and its foreclosure are a valuable protection against negligent losses and consequent increased claims on guarantees.
This power and right on the part of the commissioner applies of course not only to the case of the holder of a guaranteed bond and mortgage, but as well also to the case of the holders of participation certificates in a bond and mortgage. *Page 235 
In the latter case, however, it would necessarily involve the consent of all the holders of participation certificates in the particular bond and mortgage — for the commissioner is a trustee of the interest in such bond and mortgage for all such holders. In such a case the commissioner could assign the bond and mortgage to the participation certificate holders jointly, or to a new trustee or assignee agreed on by all. Such transfer to a new trustee for that particular bond and mortgage could of course be made by the court in a proper case even without the unanimous agreement by all certificate holders — but each such case would be determined upon its own particular facts and circumstances.
The act of the commissioner in releasing the right to collect one-half per cent. interest on these guaranteed mortgages would naturally affect the interests of the general creditors of the company, for that one-half per cent. (or the net over expenses) would fall into the general assets. That fact would not limit the full general power of the commissioner above referred to, but would of course have to be taken into consideration by him in forming his judgment.
(g), (h) and (i) Rights of participation certificate holders?
As already pointed out, such certificate holders have a prior and preferential right in the specific bond and mortgage set forth in their certificates — to the extent of the share or interest thereby assigned to them respectively. Each such certificate holder also has the right to file a general claim against the company for the full amount due and to grow due on his share of that bond and mortgage. Such claim obviously can only be a contingent claim, unless and until an actual loss has accrued to the certificate holder, and the amount of such loss be liquidated or determined. Such a loss does not necessarily occur merely by the foreclosure and sale of the mortgaged premises, if such premises be bought in by the commissioner — for he as trustee will hold the premises for the benefit of the holders of the participation certificates (including himself, as trustee for the general creditors, as to such share, if any, as remained unassigned to a particular *Page 236 
assignee), until the premises can be converted into cash, or some special settlement perhaps be made with the certificate holders. However, it is not doubted but that any certificate holder, who so desired, could elect to accept a foreclosure sale to the commissioner as fixing the amount of his loss and be entitled to the allowance of a general claim for the difference, provided he waived or surrendered all claim to any further interest in the mortgaged premises so purchased by the commissioner.
The statute does not contain any such provision as does the Federal Bankruptcy act, for determining the value of security held by a creditor so as to permit him to file a liquidated claim for the difference. The general power of the commissioner to make settlements, however, would seem undoubtedly to extend sufficiently far to authorize and permit him to make settlements and adjustments of this kind. Such settlements could of course always be submitted to this court, for its approval, either at the instance of the commissioner or of other creditors.
Except for such a settlement, no contingent claim can be allowed as an actual claim for any amount, unless and until an actual loss has occurred and its amount is fixed.
In the case of foreclosure sales of mortgaged premises, both of guaranteed mortgages and participation certificate mortgages, the commissioner would, in the ordinary case, have a prior right or interest in the proceeds of sale (or the mortgaged premises, if bought in by him) to the extent of the costs of the foreclosure. That is an expense which would have to be incurred in any event — unless the mortgagor was willing to give, and the assignee or certificate holders were willing to take, a deed as to the property without foreclosure, and the assignee or certificate holders were willing to forego claims on their guarantees; in such a case the commissioner would scarcely proceed with foreclosure.
(j) Right of commissioner to pay foreclosure expenses out of general assets?
The commissioner has no right to charge against the general assets of the company expenses which enure only to the *Page 237 
benefit of secured creditors. He may, of course, pay out of the general assets the expenses of foreclosure of such mortgages as were held by the company as general assets; and he may also, when necessary or advisable, pay in the first instance out of general assets, the expenses of foreclosure of mortgages guaranteed as a whole or in parts, reimbursing the general assets out of the ultimately recovered proceeds of sale of the mortgaged premises. As mentioned in the preceding paragraph, he would have a prior right or lien on such proceeds (or the mortgaged premises if bought in by him), for the amount of such expenses.
(k) Should income from bonds and mortgages be pooled?
Income from bonds and mortgages wholly owned by the company may all be pooled by the commissioner in the general assets of the company; so also as to income received as the share of the company in respect of the unassigned portion of any bonds and mortgages in which some shares have been assigned to others. Income which is due and payable to assignees, however, should not be pooled. The situation in the instant case is entirely different from that in the case of a company which has issued its own bonds or obligations against a trust fund composed of numerous bonds and mortgages assigned to a trustee as security for the payment of the company's bonds or obligations.
In the instant case, the company did not issue its own primary obligations, and did not set up any such trust fund. It assigned to its customers the whole of, or a part interest in, a particular bond and mortgage, and gave its secondary obligation or guarantee of payment, accompanying such assignment. Each particular bond and mortgage therefore belongs to a single assignee or group of assignees, and not to any others — nor do the assignees owning such bond and mortgage have any share in any other bond and mortgage (unless it, too, has been assigned to them). Consequently, as to any particular bond and mortgage, the commissioner holds the same in trust for the assignee or group of assignees equitably owning the same, and the interest or income therefrom must be kept separate for the benefit of such owner or owners. *Page 238 
Each bond and mortgage is a separate and distinct trust fund for the benefit of the particular person or group interested therein.
It follows, of course, that each such separate trust fund should bear its own cost of administration, which will ultimately have to be fixed and determined separately in each instance. Meanwhile they are collectively handled by the commissioner through a single organization — and to the expense of that organization all should ratably contribute, if such contribution be necessary. It would seem a fair and practical requirement or regulation that, pending the termination of each such trust, the commissioner should, for the purpose of meeting such expense, deduct from the net income received in that trust, the one-twelfth part contemplated by the original contract between the assignees and the company. At the ultimate termination of each such trust, in whatever manner it be effectuated, the particular amount which should be charged against it, for expense of administration and liquidation, can be either agreed upon between the commissioner and the beneficiary or beneficiaries of that trust, or determined by the court.
(In the foregoing, "one-twelfth part of the income" is used, instead of the "one-half per cent. of principal" mentioned in the assignment agreements, because under present conditions some mortgagors are or may be unable to pay their full six per cent. interest but may be able to pay some lesser rate, and the commissioner may deem it best for the trust to accept such lesser rate temporarily rather than to foreclose or take over the mortgaged premises. The term "net income" is used because in some instances the commissioner has had to, or may have to, enter into possession of the mortgaged premises, collect the rents therefrom and keep the premises in rentable condition, retaining the balance of the rents over such expenses as or on account of the interest due on the mortgaged debt.)
The interest received by the commissioner, except for the one-twelfth retained for expenses as aforesaid, should, it would seem, be currently paid to the owner or owners of the respective mortgages. *Page 239 
(l) Rights of holders of outstanding checks for interest?
Shortly prior to the taking over of the company assets by the commissioner the company had sent out to the holders of the mortgages and participation certificates checks for semi-annual interest thereon, and many of these checks had not been cleared at the time the commissioner took over. The holders of such of those checks as represented interest actually collected from the mortgagors are entitled to prior and immediate payment, whether such collection from the mortgagors occurred prior or subsequent to the taking over by the commissioner; subject, of course, to the right of the commissioner to make a reasonable and fair charge for actual expense in any instance where actual cost or expense was necessarily or reasonably incurred in making collection from the mortgagor.
As to any of such unpaid checks which represent interest which has not been, and shall not hereafter be, collected from the mortgagor, the holder has no preferred claim, except as against the mortgaged premises.
In other words, interest collected on a mortgage is trust money for the benefit of the owners of that mortgage; if the interest on a mortgage has not been, and is not, collected, there is no such trust fund — the company's outstanding check simply represents its liability on its guarantee.
(m) Right of holders of mortgages or certificates to payment of interest?
This has been covered in the preceding paragraphs.
(n) Right of holders of guarantees of title?
Such holders have only contingent claims unless and until there is a definite loss established; even in such case the claim is only a general claim, entitled to no preference over the claims of depositors or other general creditors.
(o) Duty to keep mortgaged premises insured?
Where the owner of mortgaged premises (comprised in mortgages assigned in whole or in part) refuses or neglects to keep up the insurance on the mortgaged premises, it would seem clearly to be the duty of the commissioner to effectuate such insurance, so as to protect and conserve the security. *Page 240 
The premium expense may be paid, in the first instance, out of the general assets (if the holder or holders of the equitable interest in the bond and mortgage will not pay it); and the commissioner will have a lien on the income or principal of the mortgage for reimbursement. If the cost of such premium is paid by the equitable owners of the mortgage, either in the first instance or subsequently, they will (if they do not obtain repayment out of the mortgaged premises), have a general claim under the company's contract of guarantee.
(p) Duty to pay taxes?
The payment of taxes is quite a different proposition from the payment of insurance premiums. The latter are comparatively small in amount, and if they be not paid, there is danger or risk of complete or considerable loss of security. With taxes, the outlay would be considerable, and the loss resulting from non-payment is comparatively small in proportion. It would seem that there is no duty on the commissioner to pay taxes (unless put in funds therefor by the equitable owners of the mortgage); he may, however, be properly charged with the duty of keeping informed as to whether taxes are or are not paid — and, in the latter event, of notifying the equitable owners of such non-payment, so that they may have the opportunity of paying them and avoiding interest or expense of sale for non-payment.
If, in any case, the commissioner should be faced with the prospect of complete loss of the security, by a foreclosure of a tax sale certificate, he should petition the court for instructions in the particular case.
(q) Right to accept conveyance from mortgagor?
There is no question as to the right of the commissioner to take, from the mortgagor or owner of mortgaged premises, a conveyance of the premises. Where such conveyance is predicated upon a cancellation of the bond and mortgage, or a release of liability on the bond, the commissioner may well have the right and power to make such a bargain, under his power to make settlements hereinbefore referred to; but unless the propriety and advisability of such a bargain appears unquestionable, or the equitable owners of the mortgage *Page 241 
consent, it would seem the preferable course for the commissioner to submit the matter to the court, on notice to all interested parties.
In case the mortgaged premises be taken over by the commissioner, they will be held by him in place of the mortgage, in trust for the equitable holders of the bond and mortgage. Such holders have a preferential right in the bond and mortgage, and in anything substituted for or representing that bond and mortgage; but have no preferential rights in any other assets held by the Middlesex Company or the commissioner.
(r) Right to purchase at foreclosure sale?
At foreclosure sale of any mortgage the commissioner as trustee holder of the mortgage may bid in the property (for the benefit of the equitable owners) and use in part payment the amount due on the decree, in the same manner as any other mortgagee. He will hold the premises so purchased, in trust for the equitable owners, as mentioned in the preceding paragraph.
(s) Necessity of election by holders of assignments or participation certificates?
Assignees of bonds and mortgages (in whole or in part) are under no obligation to elect whether they shall (1) retain the assigned interest in the bonds and mortgage and release their claim under the company's guarantee or (2) surrender their assigned interests and file claim under the guarantee. They have the right, of course, to do either of the foregoing if they choose; they also, however, have the right to retain the assigned interest in the bonds and mortgages and file contingent claims under the guarantee, and in the event of actual loss after realizing on the security will be entitled to share in the general assets as a general creditor to the extent of the loss actually sustained.
(t) Right of set-off?
No holder of a bond and mortgage or participation certificate has any right to set-off of any claim on his part under the company's guarantee, against any indebtedness owed by him to the company, unless and until, in any event, the fact and *Page 242 
amount of valid claim by him under such guarantee is definitely fixed and established. As already pointed out, the definite fixing and establishment of such loss and the amount thereof, may be accomplished by agreement between the claimant and the commissioner, or by proceedings to realize on the primary obligation and security.
If such loss has been definitely fixed and established, the right of set-off would exist.
The statute, however (P.L. 1931 p. 642), gives the commissioner full power and authority to allow just and equitable set-offs. In cases, therefore, where the claimant has not the right to demand set-off, the commissioner has the right to allow it, as a part of a settlement bargain.
(u) Right of commissioner to contribution from holders of mortgages or certificates?
As has been pointed out, each bond and mortgage is a separate trust estate. All these numerous trust estates are in the hands of the commissioner as trustee. So far as possible they are being, and should be, administered and liquidated collectively — for reasons of economy and efficiency; but in the last analysis the expense of such administration must in each instance be borne by the particular trust estate, in large part, if not entirely, because, although such administration expense is a liability of the company, the general assets of the company are not sufficient to pay its general liabilities in full. It is as yet quite uncertain as to what share or proportion thereof can ultimately be paid; that will depend to a considerable extent upon how much can be realized from the "frozen assets" which make up the greater part of the company's general assets.
In so far as cash can be realized and obtained by the commissioner-trustee — it must be utilized first for the expenses of administration of the general trust, including the preservation against loss or sacrifice of the general assets and of the bonds and mortgages and mortgaged premises comprising these numerous trust estates. Secondly, and as soon as possible or practical, it would seem that some dividend should be paid to the depositors and other general creditors. *Page 243 
The expense of preservation and liquidation of these numerous separate trusts will in all probability vary widely. Some mortgagors will not default, and the administration of such bonds and mortgages will be a matter of little, if any, expense. Others may default partially, but not sufficiently to make it advisable to foreclose or take over the mortgaged premises. In other instances the mortgaged premises will have to be sold — some of them perhaps to third parties, some will have to be bought in by the commissioner. In the latter instances the administration will of course be more costly — the rehabilitation, upkeep, rental and negotiations for sale, of real estate, costs more than the administration of bonds and mortgages as such. And these latter instances will vary amongst themselves: some properties will be more readily rentable than others, and the rents obtainable will vary in proportion to the respective costs of upkeep.
The difficulty of assessing contributions according to any reasonable or fair general scheme is therefore apparent. Moreover in many, if not in most, instances the holders of these mortgages will be financially unable to pay such contributions: the securities represent in many instances the savings of people now in need. It may be that ultimately contributions or assessment in some form may have to be resorted to; but no plan in that behalf has been presented or suggested.
It is advised that some plan or plans be worked out by counsel and presented to the court — not only with regard to possible assessment of contribution for expenses, but also, and preferably, of possible borrowing of the necessary capital for that purpose, on a pledging of the trust estates as security.
Other questions were submitted, on a later order to show cause, and will be here considered.
(1) Right of holder of guaranteed mortgage to accept a deed from mortgagor?
If the holder of such guaranteed mortgage accepts a deed from the mortgagor, releasing the obligation on the bond, and such act is done with the consent of the commissioner, the question of the holder's right to claim on the guarantee will *Page 244 
of course have been agreed on by the commissioner, as a condition of his consent. If it be done without his consent, it would seem clear that the company's liability under the guarantee would be terminated in whole or in part. Cf. Van Hoesen v. Gelfen,103 N.J. Eq. 234; 143 Atl. Rep. 137; affirmed, 110 N.J. Eq. 69;158 Atl. Rep. 343.
(2) Right of holders of participation certificates to accept deed from mortgagor?
This is not likely to occur without the commissioner's consent, since he holds the bond and mortgage, and the mortgagor would probably insist on cancellation of the mortgage. If it should occur, however, not only would the principle above stated apply, but also it would seem that the commissioner would have a lien on the premises for the amount, if any, expended by him in the administration of that particular piece of trust property.
(3) Method of determining claims on guarantees?
This has been fully covered by what has been said earlier herein.
(4), (5) Application of interest collected and of rents collected from mortgaged premises?
This also has already been covered.
(6) Right of commissioner to transfer bond and mortgage to participation certificate holders?
This also has been covered. He has that right, under his power to make settlements. The circumstances as to whether there is interest due and unpaid from the mortgagor, which has been already paid to the holders by the company, is simply a detail to be considered by the commissioner in arriving at his settlement. The certificate holders, however, have no right to require the commissioner to transfer a bond and mortgage to them, without paying or arranging for payment, of any expenses incurred by the commissioner.
Some of the questions herein considered have already been determined in some form in an order already entered herein in accordance with the generally concurring views of court and counsel at that time. That order will probably require some modification or elaboration, in accordance with the conclusions herein expressed after fuller consideration. *Page 245