By direction of the court, some parts of the opinion dealing with evidence, c., are omitted. Omissions are indicated by asterisks.
 * * * * * * *
None of the offers will be accepted, but if, at any time while the estate is still within the control of the court, a really substantial bid is made, it will be considered. Now, to the plan of liquidation.
 * * * * * * *
The plan before me has been presented by a committee representing creditors, both secured and unsecurd. It provides in general for administration and liquidation of all assets by a board of trustees — similar to a Massachusetts business trust. The original trustees are to be named by the creditors' committee subject to the court's approval and are to hold office for one year and their successors are to be chosen one-third of them each year, by the beneficiaries of the trust voting in accordance with the amount of their interest therein. The beneficiaries are to be the company's creditors, both those now secured and those now unsecured. Each creditor *Page 412 
is to receive a transferable certificate stating his interest in the estate, namely, that proportion thereof which the debt owed to him bears to the total debt. There is to be no preference or distinction among the beneficiaries. It will be the duty of the trustees to convert the assets into money as rapidly as circumstances permit without undue sacrifice and to distribute the proceeds, principal and interest.
At the hearing on the plan, none of the stockholders appeared, although they were all duly notified. They doubtless realize that the estate is insufficient to satisfy creditors and that they have no actual interest in the matter. The evidence adduced at the hearing shows this to be the fact. Of the general creditors, $105,170, or sixty-seven per cent., were represented in favor of the plan, none against, and $50,546 did not appear. * * * At the hearing, one holder of a title policy appeared in opposition to the plan but he did not allege that his title was bad or even questioned, or that he had any interest in the estate. No other general claimants opposed the plan.
The mortgage certificate holders ranged themselves as follows:
 For the plan ........................... $7,084,050 85%
 For modifications ...................... 143,700 2%
 For a continued Chancery administration, 58,400 1%
 For immediate sale ..................... 25,200
 Did not appear ......................... 1,012,100 12%

There may be slight inaccuracies in this table but substantially it is correct. I have already dealt with the matter of an immediate sale of the assets in bulk. No offer so far received will be accepted; if a sufficient bid be made, even at the last minute, it will be approved.
The arguments of the few certificate holders who oppose the plan in toto and desire that the court continue to administer the estate, fall into two branches, first, that the plan proposed is illegal, and second, that assuming its legality, it only substitutes for the court and its trustees, trustees selected by the creditors; that liquidation by the court is *Page 413 
apt to be more efficient and economical than administration by trustees chosen by the creditors themselves.
* * * It is unlikely that piece-meal conversion of the estate into money can be completed in as short a period as ten years. Most of the problems which the trustees have met in the past and which can be foreseen in the future, are purely business ones — the selection and organization of the personnel, the collection of interest and rents, repairs, accounting, decisions whether to foreclose a particular mortgage or not, fixing prices on property offered for sale, c.
There are both advantages and disadvantages to administration of property by the court of chancery or any other court. The honest conduct of the court's agents and the distribution of assets in accordance with the rights of parties determined after full hearing, are generally assured. In the present instance, the court has been fortunate in obtaining the services of trustees, not only of high character but also distinguished for their business judgment. A disadvantage generally found is a lack of energy in the administration. Receivers do the safe, routine things, but seldom do they scour the land for customers and lay awake nights devising ways to make a deal. Administration by the court is apt to be expensive, since the procedure is that of litigation. As every step must be submitted to the court, the receivers and their counsel spend a great amount of time on court work which brings no profit to the estate but for which the estate must pay. While the court of chancery can undoubtedly administer an estate for a very long period, I confess that the notion of a receivership extending ten or fifteen years is distasteful to me. The prime function of the court is the enforcement of equitable rights and not the running of a business.
Less than one per cent. of the parties who are the beneficial owners of the estate desire a continuance of the administration by the court. They want to handle the business themselves. This, it seems to me, is a perfectly natural and proper attitude and one that casts no reflection on the court or its trustees. I prefer to handle my own personal *Page 414 
business rather than turn it over to another, though he be wiser than I. And I accept as normal the similar attitude of the parties in court. The court always gives great weight to the desires of a large majority of interested parties. Thus, the court does not appoint a receiver of an insolvent corporation on the application of less than ten per cent. of the stockholders (P.L. 1931 p. 545) for the legislature assumes that the other ninety per cent. are opposed to the receivership for good reason and that their wishes should prevail. Similarly, a receiver should usually not be appointed on the application of creditors holding "a relatively trifling claim." Tachna v. Pressed SteelCar Co., 112 N.J. Eq. 411. In considering a plan of reorganization, the circuit court of appeals said: "While in such matters majorities do not govern, the approval thus signified by this vastly greater number, whose interests are identical in kind with those of the objectors, is entitled to much weight in determining whether or not the plan is equitable and fair."Jameson v. Guaranty Trust Co. of New York, 20 Fed. Rep.
2d 808. The wishes of the great majority of parties in interest may well guide me here. I will approve the plan of liquidation presented if it appears legal and fair.
I take up the objections to the legality of the plan.
(1) That the proponents of the plan have not procured, and donot expect to obtain, the written consent of stockholders. It is argued that such consent is requisite under section 16 of P.L.1934 p. 17 (of which the short title is the "Mortgage Guaranty Corporation Rehabilitation act"). This section deals particularly with plans of rehabilitation, reorganization and liquidation, and provides that such plans, with the written consent of certain parties and the approval of the court, "may be adopted and carried into effect, and all persons affected not consenting thereon shall nevertheless be bound thereby." The legislature contemplated that in some instances there would be an equity for stockholders and that the company would be rehabilitated or reorganized, and in such case the consent of two-thirds of the stockholders is required. But where assets are insufficient to satisfy the *Page 415 
creditors in full and a plan of liquidation is proposed, consent of the stockholders is not required. The present case is of the latter character.
(2) That the plan makes no provision for stockholders. An answer to this objection is that the stockholders have been duly notified, have had their day in court, and have failed to object. Furthermore, the proponents of the plan contemplate a public sale of the assets at which either the creditors' committee or the proposed new trustees will bid. If, at the sale, an offer is made in an amount greater than is required to take care of the creditors, it will be accepted, the plan will be abandoned and the surplus will go to stockholders. But if, as anticipated, the highest bid is insufficient to pay all the debts, the stockholders will, of course, have no interest in the transaction. I do not want it understood that in my opinion such a sale is necessary in order to cut off stockholders — the question is not before me. The company has been adjudged insolvent, the evidence taken on this motion proves a present insufficiency of assets to pay debts, the statute seems to permit a plan of liquidation without a conventional sale and I doubt whether the stockholders may, of right, demand a sale.
(3) That the plan does not provide for contingent andunliquidated obligations. The terms of the plan in this respect are not as clear as might be desired, but I will state what I understand is the purport of the plan and my approval of it. The order approving the plan and the declaration of trust can cover the subject in a manner beyond dispute. The plan permits participation therein by all creditors who shall be in a position to prove the amount of their debt or damage before the plan goes into effect. I take this to mean the date of the conventional sale. There are a number of title policy holders who have filed claims although they allege no breach of the terms of their policies. They will not participate in the plan, assuming that their position does not change before the sale of the property, because they have suffered no loss. Kelly v. Middlesex TitleGuarantee and Trust Co., 116 N.J. Eq. 228 (at pp. 232, 236). They are as *Page 416 
well off as if the company was amply solvent and continuing business. Other policy holders, perhaps, have been evicted from their property or some part thereof, or a lien thereon has been established, but they have not yet proved the amount due them by reason thereof under the terms of their policies. They will participate in the plan even though the action of the chancery trustees and of the court in ascertaining their loss, may not be complete at the time of the sale.
Some holders of guaranteed mortgages have also filed claims. If it shall appear that they have a present cause of action on their guarantees, they will participate to the extent that their claims may be allowed; otherwise, not. These provisions seem to me just and fair. The holder of a contingent claim cannot demand that the liquidation of the estate be delayed for his benefit, merely because of his possible future debt. Usher v. Sarco Co.,100 N.J. Eq. 428; Block v. Bell Furniture Co., 111 N.J. Eq. 551.
It is over two years since the company was taken over by the court. There has been ample time for contingent creditors to establish their claims.
(4) That the plan does not contemplate a cash payment todissenting creditors. It offers them the right to come in on the same terms as other creditors and nothing else. The committee propose to satisfy their whole bid (except unpaid expenses of administration if cash be needed for that purpose) by crediting it against the debt of the company. May a dissenting creditor be compelled to accept a certificate of interest in the trust fund subject to the reasonable terms of the proposed declaration of trust, or can he demand cash? The court of errors and appeals inMoore v. Splitdorf Electrical Co., 114 N.J. Eq. 358,
established the law of this state that in the absence of statute, minority creditors cannot be compelled to accept stock in a new corporation in payment of their debts against the old corporation but must be afforded the alternative of receiving in cash their proportionate share of the proceeds of a conventional sale of the property of the debtor company. The statute to which I have referred effectively changes this rule unless unconstitutional *Page 417 
because impairing the obligation of contracts. Section 27 of the act declares the existence of an emergency and that the statute is enacted under the state's police power and all other powers vested in the legislature.
The usual remedy of a creditor is a judgment at law, execution and sale of the debtor's property. But this right has long been subject to the interference of a court of equity in order to prevent one creditor from so using his right as to injure other creditors possessing equal rights. Quite apart from the statute, no creditor concerned in the present case can now have execution upon his debtor's property, or can insist that the trustees appointed by the court shall immediately foreclose the mortgages they hold and which are overdue, or shall sell them and the real estate and forthwith divide the proceeds. He must await the time when the trustees in the exercise of a prudent discretion shall see fit to act. His rights under the proposed plan will be substantially the same as they now are. The statute in question gives a new remedy which permits the creditors, acting through their chosen representatives, to liquidate the property themselves. From the support accorded the plan, it is obvious most of the creditors — whose rights are the same as those of the objectors — think the new remedy is more efficacious than the old. "It is within legislative competency to unseat old remedies giving substitutes which are equally efficient and in all respects as beneficial as a means of enforcing antecedent contracts." Randolph v. Middleton, 26 N.J. Eq. 543.
But I need not rest on this principle. The statute may be sustained as a valid exercise of the police power to promote the general welfare and especially to protect creditors. Krimke v.Guaranty Building and Loan Association, 112 N.J. Law 317; HomeBuilding and Loan Association v. Blaisdell, 290 U.S. 398;54 S.C. 231; People v. Title and Mortgage Guarantee Co., 264 N.Y. 69; 190 N.E. Rep. 153. The question of a cash payment to dissenting creditors is important. If only $200,000 of the creditors elect to take cash, and the committee buy in at a price that yields a twenty per *Page 418 
cent. dividend, $40,000 will be required for such creditors. The diversion of even that sum might jeopardize the whole enterprise. The difficulty of raising comparatively small sums in cash is one of the results of existing business conditions which the legislature very properly had in mind when enacting this statute. The failure of the plan to provide a cash payment to dissenting creditors does not invalidate it.
(5) That the plan puts secured and unsecured creditors on aparity. No unsecured creditor objects and therefore I need not consider whether the plan deprives such creditors of any right. The great majority of the creditors hold the company's certificates secured by pools of mortgages and by foreclosed real estate representing such mortgages. The plan proposes that the general creditors be admitted to equitable ownership of all the assets, including those now securing the company's certificates, on the same basis as the certificate holders. There are two main reasons for this provision. The unsecured creditors constitute in amount about two per cent. of all creditors, whereas the unpledged assets, on an appraised value basis, are about four per cent. of total assets. Moreover, because of the nature of the assets securing the mortgage certificates, it may be years before those assets can be liquidated and the amount of the security holders' deficiency claims against the general estate determined. Meanwhile the claims of the security holders against the general assets under the company's guaranty remain contingent in nature. The holders of contingent claims, as already pointed out, have no standing to prevent the termination of a receivership. If the unpledged assets were to be applied at this time exclusively to the payment of those general creditors whose claims have become fixed and absolute, the latter might receive payment in full, even though the secured creditors face the prospect of eventual loss.
An even more important basis for the proposed plan is simplicity. Difficult questions of allocating the administrative expense of the receivership and complicated equities of many kinds are avoided by the plan. I find that no substantial injustice would be done by treating secured and unsecured *Page 419 
creditors alike, sound business reasons favor it and yet, in my opinion, the plan cannot be approved in this respect.
The conflicting equities of the interested parties are not the result of general business conditions but grow from the contracts made by the company. Likewise, the reasons which make it advisable to disregard these equities and place all creditors on an equality, regardless of their contract rights, do not arise from the present "emergency." During the past forty years hundreds of reorganization plans, consummated through the device of a conventional sale and a cash payment to dissenting creditors, have put creditors into a single group or small number of groups in disregard of their exact contract rights. The typical railroad reorganization has accomplished the elimination of separate mortgages on specified portions of the road and the substitution therefor of a consolidated mortgage upon the entire line. The advantages which creditors may obtain by mutual concessions so as to avoid litigation and secure a simple financial structure have long been recognized and have been powerful factors in reorganization plans. These advantages are little more persuasive now than in the past. But there is one important factor which is a direct result of the general business depression, namely, the difficulty of raising the cash which normally must be paid to dissenting creditors.
Ordinarily the state cannot require a secured creditor to give up his security, even though the court find it wise for him to do so; the constitutional guarantees of the obligation of contracts and of vested rights forbid. The conflict is between these rights and the police power. "The police power is not subject to any definite limitations and is co-extensive with the necessities of the case and the safeguard of the public's interest." Camfield
v. United States, 167 U.S. 518; 17 S.C. 864. The question is "whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." Conversely the state cannot exercise this power arbitrarily; it must be exercised in a manner appropriate to the emergency, and upon reasonable conditions. "Undoubtedly whatever is reserved *Page 420 
of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects, they must be construed in harmony with each other." Home Building and Loan Association v. Blaisdell,supra. In the Blaisdell Case, contract rights were not destroyed, but only the enforcement thereof was temporarily suspended. The same is true of the other recent emergency cases to which my attention has been called (State v. Klein, 63 N.D. 514; 249 N.W. Rep. 118; 86 A.L.R. 1527; State v. Moeller,189 Minn. 412; 249 N.W. Rep. 330; Lingo Lumber Co. v. Hayes
(Tex.), 64 S.W. Rep. 835), as well as of the tenancy cases at the close of the war. Block v. Hersh, 256 U.S. 135;41 Sup. Ct. 458; Brown Holding Co. v. Feldman, 256 U.S. 170;41 Sup. Ct. 465; Edgar A. Levy Leasing Co., Inc., v. Siegel,258 U.S. 242; 42 Sup. Ct. 289. But in the present instance, the title of the secured creditors to their security will be utterly destroyed, if the liquidation plan goes into effect as drafted. I might perhaps be persuaded to the view that creditors could be compelled to surrender their securities if I were satisfied that such compulsion were necessary in order to prevent substantial loss not only to themselves but to their fellow creditors. Wide ramifications adversely affecting the whole community would follow such a loss. But some of the minority creditors have suggested a modification of the plan of liquidation which permits those creditors who so desire to retain the benefit of their security and which at the same time will leave the majority creditors to carry out the essential features of their plan. The plan as modified is not, in my opinion, as wise from a business standpoint as the one proposed by the creditors' committee, but the disadvantages are so small that it cannot be said that there is any real necessity for over-riding the contract rights of the minority. In the absence of such necessity it seems to be that the court cannot require a creditor to give up his collateral. In the conflict between police power and contract rights the extent *Page 421 
of the impairment of the obligation must be weighed against the advantage to be gained therefrom by the public or by that portion of the public directly affected.
The proponents of the plan point out that the defendant corporation is an insurance company and hence affected with a public interest and peculiarly subject to regulation by the state. But this fact does not, as it seems to me, alter the problem. The company is not now engaged and will not hereafter be engaged in the insurance business. The benefits to be obtained from depriving dissenting creditors of their security would be the same if the corporation had never been an insurer.
I here note a doubt whether the statute of 1934 authorizes that part of the plan now under discussion. The advocates of the plan rely especially on the following sentence from section 16: "Such plan or plans may contain such covenants, agreements or provisions as may be desired, including provision for * * * the reduction or readjustment of the indebtedness or obligations or liabilities of the corporation, the issuance of preferred, special or other capital stock, or certificates of interest representing interest in all or a portion of the assets, the substitution or exchange of other securities, provision for grouping or classification of assets, or the amalgamation of separate trusts affecting collaterals or securities for any issue or series of bonds or obligations of the corporation." The words quoted are certainly broad and they may have been intended to give the power asserted in this cause, but the matter is not clear.
Counsel for objectors contend that the statute of 1934 cannot be sustained as an emergency measure because its operation is not limited to a stated period. Vanderbilt v. Brunton Piano Co.,111 N.J. Law 596. Section 27 enacts that "any provision (of the statute), if there be any, which can be sustained as valid only during the existence of the emergency, shall continue in effect until such emergency shall cease." This clause is sufficient to answer the objection. Even when a statute declares an emergency and limits its own operation to a certain period, the courts must still ascertain whether *Page 422 
in fact there is an emergency and whether it still continues. The legislature may properly leave to the courts the question of the continuance of the conditions which exist when the law is passed, instead of indulging in hazardous prophecy.
(6) That the plan takes from a particular group of securedcreditors the exclusive lien in their security and gives thebenefit thereof to all creditors alike. The certificates of the company were issued in sixteen series, each series secured by a separate pool of mortgages. Under the plan, the holder of a certificate in Series U, for instance, will give up his lien to an undivided share of the assets securing that series and will take instead an interest in all the assets. Some of the series are, on paper, a little better secured than others, although the difference is small, and the testimony shows that it is impossible to say with any assurance which of any two series is the better. Again, it is a certainty that very few of the certificate holders bought their certificates with the idea that the mortgages underlying the series in which they purchased were better than the mortgages under another series. If they find themselves better or worse off than their fellows, it is a matter of luck. The same consideration which makes it advisable to treat secured and unsecured creditors alike also makes it good policy and fair for holders of the several series to merge their securities. And again, I think it beyond the power of the court to compel them to do so.
The modification of the plan to which I have referred, is in substance as follows:
The beneficial interest in the trust will be represented by two classes of certificates — general and special. Special trust certificates will be issued to such mortgage certificate holders as may express a preference for them within a reasonable time — say, thirty days. They will run in series, one series for each old issue of mortgage certificates. Every special trust certificate shall show on its face a sum equal to the par value of the old security in exchange for which it is issued. Each series of special certificates shall represent the beneficial ownership of an undivided portion of the assets which were pledged to secure the mortgage certificates to *Page 423 
which the series corresponds, but not more than the face of the certificates. When the face of the certificates with interest shall be paid, the certificate will be canceled and the holder thereof will have no further interest in the trust. The undivided portion of the assets, represented by a series of such certificates, shall be that percentage of such assets which equals the percentage of old certificates whose holders elect to take special rather than general trust certificates.
For example, assume that there are now outstanding $500,000 certificates of "U" series and that the holders of ten per cent. thereof, with a par value of $50,000, elect to take special certificates. Those certificates would represent ownership of ten per cent. of the assets (in whatever form they may assume) now securing the "U" bonds, but not more than $50,000 with interest. Assume further that the interest rate be four per cent.; that during ten years there becomes available for distribution from income and corpus of these assets the sum of $500,000; it would be distributable $60,000 ($50,000 plus interest for ten years on the unpaid balances which amounts, say, to $10,000) to the special certificate holders and $540,000 on the general certificates. The special certificates of this series would then be canceled and all further sums realized on these assets would go into the general fund. But if the assets of series "U" yield no more than $400,000 the holders of special certificates must be satisfied when they receive their pro rata of that sum, while general certificate holders can look to other assets.
General certificates will be issued to general creditors and to such mortgage certificate holders as do not take special certificates. They will form a single series, will have no face value and will represent beneficial ownership of the unpledged assets, the undivided portion of pledged assets which is not represented by special certificates and the remainder of such assets after the special certificates are satisfied.
This modification of the plan I approve. It meets the objection to the original plan by preserving to dissenting creditors their essential right, namely the benefit of their security. It does not give them the recourse to other assets which the *Page 424 
other creditors have, but the dissenting creditors stand, as to such other assets, merely as contingent claimants, who have not established a present right.
The allocation of assets at the beginning of the trust may be determined by the final account of the present trustees as approved by the court. The new trustees should keep their accounts in such manner as to show clearly the assets making up each specific pool against which special certificates are outstanding. A formula for distributing general or overhead expenses should be stated in the declaration of trust.
Additional expenses will necessarily be incurred in order to keep separate account of the assets underlying special trust certificates, but it ought not amount to more than a few hundred dollars a year. This cannot be burdened on the special certificate holders alone, but must be borne by the whole estate. The segregation of accounts may also cause dispute and possibly litigation, but this hazard must be run.
 * * * * * * *
There are a few details which I will briefly take up. Other small questions will doubtless crop up when the order is presented.
(1) The plan proposes the issuance of interest adjustment scrip. With the available cash resources now in the estate such scrip seems unnecessary. The order may provide in lieu of scrip, for payment by the chancery trustees.
(2) The rights of the parties should be determined by the order and by the declaration of trust without need of referring to the document "New Plan of Liquidation" on which this hearing has been based, or to the deposit agreements mentioned therein.
(3) The written consent of two-thirds of the holders of each series of mortgage certificates and not merely two-thirds of all certificate holders will have to be obtained; likewise the consent of two-thirds of the general creditors.
(4) The plan rests a number of matters in the discretion of the creditors' committee; for instance, the amount of cash adjustment to be paid in order to reduce claims of general creditors to round figures. While the committee may be left *Page 425 
with discretion whether to pursue or abandon the plan, decisions affecting the rights of parties, if the plan be put into effect, must be made by the court and not delegated to the committee. Likewise the plan proposes that the new trustees may borrow money if the creditors' committee determine it to be necessary. The powers of the new trustees will be not contingent upon the approval of the committee.
(5) The new trustees do not seem to be given authority to sell the assets in bulk; they should have such power, though perhaps hedged about by requiring approval of a certain percentage in amount of the interested parties.
(6) The new trustees will be selected by the court, nominations by the creditors' committee and other interested parties will be welcome. There should not be too many trustees; they will act as a board of directors. Too big a board often leads to a lack of interest on the part of its members. The trustees will receive modest compensation for actual attendance at meetings to be fixed by the declaration of trust. I do not think they should be eligible for further compensation for special services.
(7) The plan proposes that the declaration of trust may be amended with the consent of two-thirds in amount of the beneficiaries. This puts it into the power of the majority creditors to impose on dissenting creditors terms which the court might not approve. Amendments must be subject to the approval of the court on bill or petition filed for that purpose.
(8) The plan provides that the expenses of the creditors' committee as determined by the committee shall be paid by the new trustees. Such expenses will have to be approved by the court and may well be paid by the chancery trustees instead of the new trustees.
(9) At the hearing counsel for the committee, as I recall, stated that the plan would be amended to provide for periodical accountings in the court of chancery. I do not think this necessary or desirable. There should, of course, be annual audits and reports to the beneficiaries prepared in the form of corporate financial statements. The new trust should be *Page 426 
definitely out of the court of chancery, until it be brought in as any other express trust may be brought before the court.
I have not carefully studied the draft of the declaration of trust which was submitted just before the hearing and so make no comment on it. Counsel for the creditors' committee will prepare an order in accordance with the view above stated and present it on notice to the counsel whose appearances are noted at the head of this opinion.